CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CHRISTIAAN HIGHSMITH (CABN 296282)
CHARLES F. BISESTO (CABN 271353)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7230
Christiaan.Highsmith@usdoj.gov
Charles.Bisesto@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAPHETH DILLMAN,<br><br>Defendant. | Case No. CR. 23-00140 RS<br><br>**UNITED STATES' OPPOSITION TO DEFENDANT JAPHETH DILLMAN'S RULE 29 AND 33 MOTION FOR ACQUITTAL OR A NEW TRIAL**<br><br>Hearing Date: November 3, 2026<br>Hearing Time: 9:30 a.m.<br>Courtroom: 12, 19th floor<br><br>Hon. Richard Seeborg |

TABLE OF CONTENTS

I. DILLMAN IS NOT ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29 ....... 1

A. Legal Standard ....... 1

B. The Court Should Rule on Dillman's Rule 29 Motion Regarding Counts Two Through Five Without Considering Dillman's Testimony and Exhibits Admitted During his Testimony ....... 2

C. The Evidence Established Knowing Participation in the Fraud and the Connection Between Each Charged Wire and the Scheme ....... 2

1. The Government Proved Knowing Fraud, Not Merely an Unsuccessful Software Project ....... 2

2. The Evidence Established Dillman's Knowing Participation in the Conspiracy Charged in Count One ....... 5

3. The Charged Repayment Wires Furthered the Scheme ....... 6

(i) Count Two: The May 17, 2018 Repayment to Amy Tucker ....... 7

(ii) Count Three: The May 24, 2018 Repayment to Nathan Hennings ....... 8

(iii) Count Four: August 7, 2018 Repayment to Sugar Mountain LLC ....... 9

(iv) The August 28, 2018 Email Furthered the Scheme Charged in Count Five ....... 10

D. The Complete Trial Record Supplies Additional Support for Denial ....... 11

II. DILLMAN IS NOT ENTITLED TO A NEW TRIAL UNDER FED. R. CRIM. P. 33 ....... 11

A. Legal Standard ....... 11

B. The Government's Reference to Bernie Madoff During Rebuttal Is Not Grounds for A New Trial ....... 12

C. The Court's Deliberate Ignorance Instruction Was Correct and Cannot Provide a Basis for a New Trial ....... 14

III. CONCLUSION ....... 16

# TABLE OF AUTHORITIES

<u>Federal Cases</u> <u>Page(s)</u>

*Kousisis v. United States*, 605 U.S. 114 (2025) .......... 4, 5

*Schmuck v. United States*, 489 U.S. 705 (1989) .......... 6

*United States v. A. Lanoy Alston, D.M.D. P.C.*, 974 F.2d 1206 (9th Cir. 1992) .......... 11, 13

*United States v. Alarcon-Simi*, 300 F.3d 1172 (9th Cir. 2002) .......... 1

*United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005) .......... 1, 2

*United States v. Del Toro–Barboza*, 673 F.3d 1136 (9th Cir. 2012) .......... 12

*United States v. Falsia*, 724 F.2d 1339 (9th Cir. 1983) .......... 13

*United States v. Giampa*, 758 F.2d 928 (3d Cir.1985) .......... 1

*United States v. Martin*, 228 F.3d 1 (1st Cir. 2000) .......... 1

*United States v. Maze*, 414 U.S. 395 (1974) .......... 6

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) .......... 2, 4, 11

*United States v. Pimentel*, 654 F.2d 538 (9th Cir. 1981) .......... 12, 14

*United States v. Ramos-Atondo*, 732 F.3d 1113 (9th Cir. 2013) .......... 14, 15

*United States v. Reyes-Alvarado*, 963 F.2d 1184 (9th Cir. 1992) .......... 1

*United States v. Rojas*, 554 F.2d 938 (9th Cir. 1977) .......... 1

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) .......... 1

*United States v. Sampson*, 371 U.S. 75 (1962) .......... 6

*United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014) .......... 6

*United States v. Young*, 470 U.S. 1 (1985) .......... 13

<u>Federal Rules</u>

Fed. R. Crim. P. 29 .......... 1

Fed. R. Crim. P. 29(b) .......... 2

Fed. R. Crim. P. 33 .......... 1, 11

Fed. R. Crim. P. 52(a) .......... 11

The United States submits this opposition to defendant's motion for acquittal on all counts under Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial under Fed. R. Crim. P. 33. The motion should be denied.

## I. DILLMAN IS NOT ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER RULE 29

### A. Legal Standard

It is well-established that, when considering a motion for acquittal under Rule 29, the Court views the evidence in the light most favorable to the government and draws all reasonable inferences in the government's favor. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal quotation omitted); *see also United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (that inferences favorable to the defendant could also be drawn from the evidence is of no import because "the task of choosing among permissible competing inferences is for the jury, not a reviewing court").

The Court may not view the government's evidence in isolation but must examine that evidence as a whole. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Circumstantial evidence and reasonable inferences drawn from that evidence are sufficient to sustain a conviction. *United States v. Reyes-Alvarado,* 963 F.2d 1184, 1188 (9th Cir. 1992). The Court must also credit both direct and circumstantial evidence without evaluating or speculating on the weight the jury might give it. *United States v. Martin*, 228 F.3d 1, 10 (1st Cir. 2000).

In ruling on a Rule 29 motion, the Court does not intrude on "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Alarcon-Simi*, 300 F.3d at 1176 (*quoting United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977)). Thus, the Court may not weigh the evidence, substitute its opinion for that of the jury, or make credibility determinations. *United States v. Giampa,* 758 F.2d 928, 934-35 (3d Cir.1985). The Court's approach at this stage is to determine whether the government adduced evidence sufficient to sustain a conviction. *Id.* Indeed, "[a] finding of insufficiency should be 'confined to cases where the prosecution's failure is clear.' Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to

usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citations omitted).

**B. The Court Should Rule on Dillman's Rule 29 Motion Regarding Counts Two Through Five Without Considering Dillman's Testimony and Exhibits Admitted During his Testimony**

Under Fed. R. Crim. P. 29(b), where the defendant moves for a judgment of acquittal after the close of the government's evidence, and where the Court reserves decision, the Court must decide the defendant's motion for acquittal on the basis of the evidence at the time the ruling was reserved.

Here, Dillman moved for judgment of acquittal as to Counts Two through Five at the close of the government's evidence. Tr. 1483-84. Therefore, the Court should rule on Dillman's motion without considering Dillman's testimony or the exhibits admitted during his testimony, which were introduced after the close of the government's evidence.

With regard to Count One, however, Dillman did not move for acquittal at the close of the government's evidence. Tr. 1483-84. In fact, the defense specifically omitted Count One from its oral motion for acquittal. *Id.* Later, in his filed motion, Dillman moved for acquittal as to Count One and Counts Two through Five. Dkt. 145. Accordingly, the Court may consider Dillman's testimony and the exhibits admitted during his testimony in deciding whether to grant the motion for acquittal as to Count One.

Nonetheless, even if the Court excluded Dillman's testimony and the exhibits admitted during his testimony from its evaluation of the defendant's Rule 29 motion as to Count One, the result would be the same. The Court should deny the defendant's Rule 29 motion in its entirety even without consideration of Dillman's testimony and the exhibits admitted during his testimony.

**C. The Evidence Established Knowing Participation in the Fraud and the Connection Between Each Charged Wire and the Scheme**

**1. The Government Proved Knowing Fraud, Not Merely an Unsuccessful Software Project**

Wire fraud requires proof that the defendant intended to deceive another person and, through that deception, obtain money or property. *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020). The defense emphasizes that Dillman and his engineers were genuinely developing software and argues that technical incompletion alone does not establish fraud. The government's theory, however, was not

that an unfinished system or a missed development target, standing alone, constituted fraud. It was that Dillman obtained investors' money through material representations about an automated trading system (the Autotrader) that already existed, despite knowing those representations were false.

In fact, with respect to the materiality of the misrepresentations, the investors' trial testimony distinguished a functioning product from an idea that still needed to be built. Michael Mears received Dillman's June 30 solicitation describing immediate activation of the Autotrader and testified that he would not have invested in a development from scratch. Tr. 402-04, 420-21; Ex. 101. Amy Tucker understood that a minimum viable product already functioned, rather than being vaporware. Tr. 461-65. Neil Sunkin described the existing system and explained that the Autotrader's immediate ability to automatically trade cryptocurrency between exchanges was important to his decision. Tr. 620-25. And Brad Grimm, likewise, testified that the existence of the technology mattered to his investment. Tr. 1009-10. The investors' testimony showed that the Autotrader's purported ability to automatically trade cryptocurrency between exchanges mattered to their decisions: they understood they were investing in a fund expected to use functioning or near-ready technology, not to finance its development from scratch.

Additionally, Dillman's own communications supplied independent evidence of knowing falsity. In June of 2017, in messages with David Mata, Dillman described development of the Autotrader as a future undertaking. Tr. 788-94; Def. Ex. 3. Yet, in an email to a prospective investor on July 9 of that same year, Dillman represented that the company had built an Autotrader operating across 30 exchanges. Ex. 199. Mata testified that this representation was false, that they had discussed the absence of an Autotrader, and that he allowed the representation to stand because it would attract investors. Tr. 863-65; Ex. 199. Dillman's own messages to Brad Grimm on July 16, 2017 echoed Mata's account of the technology's actual state: Dillman said arbitrage was being performed by hand and that automation rules still needed coding in Python. Tr. 1011-16; Exs. 251-253. The jury could infer from these contrasting descriptions that Dillman knew the Autotrader had not been built but nevertheless decided to tell prospective investors that the technology already existed and was operational.

The engineers' testimony further corroborated the conclusion that Dillman knowingly misrepresented the Autotrader to investors. Darren McKeeman described regular progress

communications with Dillman and confirmed that he never told Dillman the automatic trader existed or approached completion. Tr. 732-33, 761-62. John Szeder, another engineer Dillman brought on board, described discarding McKeeman's work and starting over, with Dillman receiving progress information. Tr. 1085-87, 1091-93; Ex. 110. Emmanuel Odeke further described engineering meetings and communications involving Dillman and an in-person update in which the technology could not be described as automatic. Tr. 1185-86, 1194-96. Odeke also discussed a January 14 email, on which Dillman was copied, describing untested order-placement code subject to a $500 cap. Tr. 1196-1202; Ex. 112. Mata separately testified about his January 16 text exchange with Dillman, in which he told Dillman that automation remained approximately a week and a half away. Tr. 926-29; Ex. 189.

The defense points to genuine progress in developing the Autotrader, but that progress did not by itself show that Dillman honestly believed the system already had the capabilities he represented to investors in June, July, and August 2017. Szeder described progress toward a functioning system, including code that provided a reasonable starting point, software that identified trading opportunities, and a usable interface. That testimony did not, however, establish that the system could automatically execute trades across exchanges as Dillman had represented to investors. Tr. 1091-93, 1112-16. The jury could therefore credit the evidence of development while still finding that Dillman knowingly overstated the system's existing capabilities. Nor did Mata's control over technical development negate Dillman's knowledge: in fact, the jury heard evidence that Dillman received progress updates directly and himself described trading as manual and automation as unfinished. Tr. 732-33, 761-62, 1011-16, 1091-93; Exs. 110, 251-253.

Even more, evidence of the fund's legitimate business activities did not require the jury to reject the evidence of knowing fraud. Profitable trades did not establish that those profits were generated by an Autotrader, and efforts to develop the technology or obtain professional services did not establish that Dillman honestly believed the capabilities he described to investors already existed. *See* Tr. 1459-63. Nor did the return of some investors' principal foreclose a finding that Dillman intended to obtain their money through deception. *See Miller*, 953 F.3d at 1102-03. The relevant question was whether Dillman knowingly used material misrepresentations to induce investors to part with their money, not whether he intended them ultimately to suffer a net economic loss. *See Kousisis v. United States*, 605 U.S. 114

(2025). The investor testimony established the importance of the claimed Autotrader to their investment decisions, and Dillman's communications and the engineers' testimony supported the finding that he knew those claims were false. Tr. 402-04, 420-21, 461-65, 620-25, 732-33, 761-62, 863-65, 1009-16; Exs. 101, 199, 251-253.

#### 2. The Evidence Established Dillman's Knowing Participation in the Conspiracy Charged in Count One

The government agrees that an agreement to operate a business or develop software is not, standing alone, an agreement to commit fraud. Nevertheless, the evidence here established more than a shared interest in the fund's success.

Mata's testimony connected their joint fundraising to knowingly false descriptions of the technology. He testified that the June trading results came from manual trades, that he told Dillman so, and that the investor presentation (also known as the pitch deck) misrepresented the operation and performance of the Autotrader. Tr. 781-85, 799-801. Even more, Dillman and Mata's June text messages discussed building automation while investors were being solicited. Tr. 788-94; Def. Ex. 3. Most directly, Mata testified that Dillman made the false representation in a July 9, 2017 email about the Autotrader operating across 30 exchanges. Tr. 863-65; Ex. 199. And Mata further described his discussions with Dillman about the Autotrader's absence and their joint decision to let that representation stand to mislead investors and attract their investments. *Id.* The jury could find, based on clear evidence that Dillman and Mata shared a false narrative about the fund's technology, that they agreed to obtain investors' money through fraud rather than merely agreeing to participate in an unsuccessful business.

Mata and Dillman's subsequent conduct reinforced that inference. Mata described the misleading cold-storage label used for the Aether United transaction and their discussions of it. Tr. 889-91. He also described the speculative AML Bitcoin purchase, its presentation through a purported cold-storage arrangement, and Dillman's participation in those transactions. Tr. 894-904; Exs. 203-204. Their communications concerning how those holdings would appear in the fund's records supplied additional evidence of coordinated concealment. Tr. 905-11; Exs. 228, 183. These acts allowed the jury

to distinguish an agreement to trade cryptocurrency from an agreement to misrepresent the fund's operations to investors.

The defense points to Mata's admitted false sworn declaration and cooperation incentive as reasons to question his credibility. The jury heard both matters. Tr. 935-50. Those matters provided grounds for impeachment, not a rule requiring rejection of his entire testimony. Despite this impeachment evidence, Mata's account was corroborated by his contemporaneous text messages with Dillman, Dillman's contemporaneous statements, and the engineers' descriptions of unfinished automation. Considering the totality of the evidence, a rational jury could find both an agreement to commit wire fraud and Dillman's knowing, intentional participation in it, as the jury instructions required. Tr. 1697-99.

### 3. The Charged Repayment Wires Furthered the Scheme

A charged wire need not contain a lie or obtain additional money. It must further execution of the scheme—a transaction incident to an essential part of the scheme or a step in its execution suffices. *Schmuck v. United States*, 489 U.S. 705, 710-15 (1989). Planned lulling can meet that requirement after victims have surrendered their money. *United States v. Sampson*, 371 U.S. 75, 80-81 (1962). By contrast, transactions occurring after a scheme's completion do not qualify merely because they follow the fraud. *See United States v. Maze*, 414 U.S. 395, 400-03 (1974).

Whether a later communication furthered the fraud depends on the scope of the scheme and whether it was still ongoing. A general desire to avoid detection is insufficient to bring a communication within an otherwise completed scheme. But the plan may evolve while the scheme is underway, and a later communication may carry out that evolving plan. *United States v. Tanke*, 743 F.3d 1296, 1303-06 (9th Cir. 2014). In *Tanke*, the challenged communication supported the conviction because it formed part of a continuing sequence of misleading transactions and statements. *Id.* at 1305-06.

Here, the repayment plan underlying Counts Two, Three, and Four arose while the broader scheme of misrepresenting the fund's performance, earnings, and distributions was ongoing. Simply put, the scheme had not ended, it was ongoing, and the repayment wires furthered the scheme. Mata testified that Dillman selected repayment recipients and amounts because the fund lacked enough money

to repay everyone. Tr. 913-15. This proposal led to the return of selected investors' principal while leaving them expecting a calculation or payment of additional gains. Tr. 496-500; Ex. 94. For example, Hennings and Sunkin continued to expect profits after their principal was returned. Tr. 366-69, 683-84. Dillman's communications during these repayments fit that continuing plan: July 2018 text messages between Dillman and Mata discussed investor complaints, investigations, and threatened litigation, and, at the same time, the August 2018 email update to investors continued to reassure investors about the fund's performance and forthcoming payments. Tr. 932-35; Exs. 196, 80. The August 28, 2018 email further showed that the scheme was ongoing because Dillman touted the "effective" automated platform and implied funds remained for distribution, though no trades had been automatically executed and Block Bits had almost no funds left. Ex. 80. Taken together, this evidence permitted the jury to find that Dillman used selective principal repayments and assurances about unpaid gains to maintain investor confidence and delay demands for an accounting or recovery while the fund's false account persisted.

Dillman contends that none of the three repayment wires furthered the scheme, but offers a different explanation for each: Tucker's payment followed a documented proposal to return principal before calculating earnings, and the partnership agreement permitted distributions to selected partners; Hennings's reduced urgency to contact law enforcement does not establish Dillman's purpose; and Sunkin's payment addressed an overdue obligation amid demands and threatened litigation. The government does not argue that an unpaid obligation, a payment's effect on an investor, or a general desire to avoid detection, standing alone, proves that a wire furthered the fraud. Nor does the partnership agreements' authorization of selective distributions resolve whether these particular payments served the ongoing scheme. As discussed below, those circumstances were for the jury to weigh, but they did not foreclose the inference that the repayments furthered the ongoing scheme.

**(i) Count Two: The May 17, 2018 Repayment to Amy Tucker**

An April 25, 2018 email from Dillman to the limited partners, reproduced in Exhibit 94, announced that the fund would first return principal from funds released by the GDAX exchange and calculate earnings later. Ex. 94. Follow-up emails show Amy Tucker providing her bank information, Mata coordinating the wire, and Tucker confirming receipt while looking forward to the CPA's report. Tr. 496-99; Exs. 94, 41. In her testimony, Tucker described feeling relieved as she continued to expect

gains and remained optimistic about another fund after receiving her principal. Tr. 499-500. Tucker understood that she had invested in a fund with a functioning product, and the reports of substantial gains reinforced her belief that the Autotrader worked when, in fact, it never existed as a working product. Tr. 461-65, 480-85. The evidence therefore showed that the repayment reinforced Tucker's belief that the fund and the Autotrader were functioning as promised: she received her principal while expecting the fund to calculate and pay her gains later.

Dillman argues that Tucker's repayment followed the documented principal-first proposal, was authorized by the partnership agreement, and occurred after she had already expressed interest in Fund II. Those circumstances support a business purpose for the transfer, but they do not foreclose the inference that the repayment also furthered the fraud scheme. The government does not contend that the repayment caused Tucker's interest in Fund II. Rather, the jury could find that repaying Tucker's principal while leaving her purported earnings unresolved reinforced the false appearance of successful performance and led her to keep awaiting her supposed earnings. Exhibit 94 supports that inference: Dillman told investors that principal would be returned first and that a CPA would calculate earnings later; and in fact, after receiving her principal, Tucker confirmed that she was still looking forward to the CPA's report. Tr. 491-500; Exs. 41, 93, 94. The jury could therefore find that the repayment maintained Tucker's confidence in the fund while the promised earnings remained unresolved, and thus furthered the scheme.

**(ii) Count Three: The May 24, 2018 Repayment to Nathan Hennings**

Hennings's testimony directly supported the lulling inference. Before the May 24, 2018 return of his $50,000 principal, Hennings had repeatedly requested repayment of his investment. Tr. 366-67; Ex. 41. He testified that repayment legitimized the fund in his view, reduced the urgency of contacting law enforcement, and left him awaiting reported profits. Tr. 366-69.

His reaction alone did not conclusively establish Dillman's purpose. But, considered with the demands for payment, continuing expectations of earnings, and Mata's testimony that Dillman determined who would receive repayments and how much, it supported an inference that Dillman used the payment to quiet a demanding investor while preserving the deceptive account of the investment. Tr. 366-69, 913-15. The defense argument that returning principal would naturally reassure Hennings

does not defeat the lulling theory. In fact, the jury could logically infer that the repayment furthered the scheme by maintaining Hennings' confidence in the fund and delaying detection of the fraud.

**(iii) Count Four: August 7, 2018 Repayment to Sugar Mountain LLC**

Similar to Hennings, Sunkin's repeated demands and escalating concern preceded the $24,970 repayment from Dillman and Mata to his LLC. The jury heard the correspondence and Sunkin's account of seeking answers and payment. Tr. 676-84; Exs. 79, 42. Additionally, text message communications between Dillman, Mata, and Gary Baiton, at the end of July 2018, established that complaints, investigations, and threatened litigation were contemporaneous pressures known to Dillman. Tr. 932-34; Ex. 196. Because Dillman participated in those communications shortly before Sunkin's repayment, the jury could consider them alongside Sunkin's demands in assessing whether the payment furthered the scheme.

After receiving his principal, Sunkin remained hopeful about receiving profits too. Tr. 683-84. Together with Dillman's control over repayment recipients and amounts, and the continuing communications to investors about the fund's purported performance and remaining distributions, that evidence permitted the jury to find that the Sunkin repayment furthered Dillman's ongoing lulling plan and an effort to further the scheme by misleading investors into thinking the Autotrader existed and the fund was generating profits. Tr. 913-15, 934-35; Ex. 80. Despite this evidence, Dillman argues that his efforts to obtain money from Gary Baiton, including his requests for a funding timetable and concrete information, support a legitimate explanation for the repayment. Tr. 932-34; Ex. 196. But those efforts did not preclude the jury from finding that Dillman also used the repayment to ease investor pressure while continuing to reassure investors about performance and distributions. Crucially, from January to August 2018, while Block Bits bank and cryptocurrency holdings dwindled down to almost nothing, Dillman never told investors the truth about their investment or the status of Block Bits finances. Viewed as a whole, the evidence permitted the jury to find that the repayment furthered the scheme even if it also served a legitimate repayment purpose.

**(iv) The August 28, 2018 Email Furthered the Scheme Charged in Count Five**

The email update charged in Count Five continued Dillman's scheme by providing investors with a false and misleading account of the Autotrader and investment performance while describing an unresolved third-party position, anticipated distributions, and a future fund. Tr. 371-72, 501-03, 684-86, 934-35; Ex. 80. Mata testified that the account of effective technology was false, that the Autotrader never functioned as represented, and that this August 28, 2018 communication was intended to keep investors satisfied and encourage participation in another fund. Tr. 934-35. Put simply, the jury could credit that account together with the independent evidence of Dillman's knowledge.

Dillman argues that the fund was genuinely developing trading software: the software could identify trading opportunities, trades were placed manually, and work on automation continued. But software that identified trading opportunities was not the same as a system that automatically executed trades. The distinction was clear from the engineering testimony: the Autotrader's interface could identify opportunities but still required human action. Tr. 1196-1202. The question was whether Dillman nevertheless gave investors a materially misleading account of how the fund operated and generated results while automation remained unfinished, as reflected in his messages and the technical updates. Tr. 761-62, 926-29, 1011-16, 1196-1202; Exs. 112, 189, 251-253. Despite Dillman's contentions to the contrary, evidence of genuine Autotrader development and some accurate statements did not require the jury to accept the August 28, 2018 email's overall account as truthful.

Even more, investor testimony supported the August email's function in the scheme. Amy Tucker understood the description of "effective technology" as meaning that the Autotrader worked. Tr. 501-03. Julie Robinson likewise described accepting the account of functioning technology and retaining hope for principal and profits. Tr. 1307-09. The government need not show that every recipient was actually lulled; Tucker's and Robinson's testimony supported the inference that Dillman used the August email update to further the fraud scheme, sustain investor confidence, and encourage investors to await payment.

**D. The Complete Trial Record Supplies Additional Support for Denial**

The evidence discussed above was admitted before the Court reserved ruling on the Rule 29 motion as to Counts Two through Five. Dillman's later testimony is not needed to sustain those counts and cannot cure a deficiency in that earlier record. Count One is different: the defense did not move for judgment of acquittal on the conspiracy count until after the trial concluded. The Court may therefore consider Dillman's testimony in deciding the Rule 29(c) motion on Count One, and that testimony further supports denial of acquittal.

In his testimony, Dillman acknowledged the system's failure to trade automatically between exchanges and conceded misleading descriptions of cold storage and other aspects of the business. Tr. 1645, 1661-62, 1673-74, 1678. Those admissions supported the inference that he knew investors had received a false account of the fund. Dillman also testified that he selected investors who were upset or might sue for repayment, providing additional evidence of his role in managing investor pressure. Tr. 1593-95. Considered with the evidence that he and Mata coordinated fundraising and investor communications, this testimony supported the jury's finding that Dillman knowingly joined the conspiracy to defraud investors.

Finally, Dillman points to his January 2018 demonstration of the trading interface shown in Defense Exhibit 26, arguing that its apparent operation supports his account of a genuine effort to develop the Autotrader. That demonstration showed an Autotrader interface under development, but it did not establish that the Autotrader could execute trades automatically between exchanges. Moreover, the demonstration occurred many months after the earlier investor solicitations, and the jury also heard testimony that the interface required human operation and displayed error messages. Tr. 1613-18, 1657-59; Def. Ex. 26. That evidence supported the defense's account of development, but it did not require the jury to find that Dillman lacked knowing participation in the fraud conspiracy or that the charged wires fell outside the scheme. The Rule 29 motion should therefore be denied on all five counts.

**II. DILLMAN IS NOT ENTITLED TO A NEW TRIAL UNDER FED. R. CRIM. P. 33**

**A. Legal Standard**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial 'if the interest of justice so requires.'" Order Denying Mot. for Judgment of Acquittal and Denying Mot. for

New Trial, *United States v. Andrade*, 20-cr-249 RS, Dkt. 694, at 2. "To succeed on a motion for a new trial, the defendant must show an error affected his substantial rights." *Id.* (citing Fed. R. Crim. P. 52(a); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)). The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that there has been a "serious miscarriage of justice." *United States v. A. Lanoy Alston*, *D.M.D. P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). The Ninth Circuit has held that such motions are generally disfavored and should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981); *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012) (citing *Pimentel*, 654 F.2d at 545).

**B. The Government's Reference to Bernie Madoff During Rebuttal Is Not Grounds for A New Trial**

Defendant argues that he is entitled to a new trial because, he claims, the government's rebuttal improperly prejudiced the central intent issue by analogizing Defendant's conduct to that of Bernie Madoff. Defendant is wrong. Defendant cites no caselaw to support his claim that the government's Madoff reference affected his substantial rights and warrants a new trial. He fails to show that the interests of justice require a new trial. And he fails to show a serious miscarriage of justice or that this is an exceptional case in which the evidence preponderates heavily against the verdict.

First, the defense claim that the government analogized Dillman's fraud to the Bernie Madoff fraud is factually incorrect. The government was responding to a misleading claim by the defense. During closing, defense counsel argued that it was impossible for Dillman to have the intent to commit fraud because he paid some investors their principal back. Counsel argued:

> Ten people got their money back…. [T]en of them got their money back, six of them got profit. Fraudsters don't do that…. They don't give money back. They don't give you profit. They don't do it. If they're intending to cheat you, if they're intending to defraud you, they don't do that….

Tr. 1807-08 (Aug. 21, 2026).

The government responded to this specific claim in rebuttal:

> Okay. So Mr. Tamor said, 'Hey, look, a fraudster, he doesn't return money to his victims.' Mr. Tamor, again, misdirection, 'It can't possibly be a

> fraud because he returned some of the money to his victims.'
>
> That's what Madoff did. That's a Ponzi scheme. That's taking money and returning it to some of the victims so that they don't go to the authorities, don't sue you, to trick them, to deceive them.

Tr. 1815 (Aug. 21, 2026).

The government's reference to Madoff was a response to defense counsel's claim in closing argument that it is impossible for a defendant to formulate the intent to commit fraud if he returns money to investors. *See United States v. Falsia*, 724 F.2d 1339, 1342 (9th Cir. 1983) ("[W]here the defendant opens the door to an argument, it is 'fair advocacy' for the prosecution to enter."). Contrary to the defense argument, a defendant can formulate the intent to commit fraud even when he returns money to investors or where he returns a profit to some investors. The defense concedes that the government was entitled to respond to the argument that Dillman could not possibly have intended to commit fraud because he paid some investors money back.

Further, referencing Madoff did not improperly prejudice the defense because the idea that investors were concerned that Dillman might be perpetuating a Madoffesque fraud was in evidence. Victim Brad Grimm—while deciding whether or not to invest with Dillman—specifically asked Dillman: "Where does the trading actually take place (server location), and is there a third-party setup to mind the investors to protect against Madoffesque shenanigans." Tr. 1005; Ex. 247. In other words, Grimm specifically asked questions that went to Dillman's intent to misrepresent the state of the Autotrader, and Grimm formulated those questions by referring to Madoff. Therefore, the government did not improperly prejudice the issue of Dillman's intent when referencing Madoff to directly rebut a defense claim about Dillman's intent to commit fraud.

Further, Defendant simply claims that the government prejudiced the intent issue, he does not argue a "serious miscarriage of justice." *Alston*, 974 F.2d at 1211. Indeed, the government's reference to Madoff in rebutting a specific defense argument does not rise to the level of a serious miscarriage of justice. *See Falsia*, 724 F.2d at 1343 ("[e]ven if the prosecutor's statements could be considered "slightly improper," we cannot conclude that it more probably than not affected the verdict so as to require reversal"); *see also United States v. Young*, 470 U.S. 1, 11-12 (1985) (upholding conviction and

discussing "invited response" rule). Brad Grimm's testimony and the Facebook messages between Grimm and Dillman establish that Grimm's Madoff fraud concern was a real issue already in evidence and that it was a concern that an investor was proactively raising with Dillman. Indeed, the evidentiary record demonstrates that Dillman had to assuage Grimm's concerns about "Madoffesque shenanigans" and whether the Autotrader actually worked before Grimm invested. These facts go directly to Dillman's intent.

Further, the defense does not claim—and it cannot establish—that this is an "exceptional cases in which the evidence preponderates heavily against the verdict." *Pimentel*, 654 F.2d at 545. The evidence of Dillman's guilt in this case was overwhelming. Numerous investor-victims testified that Dillman represented that a working Autotrader existed in order to induce their investment. Dillman's developers unequivocally testified that a working Autotrader did not exist at the time Dillman solicited investment and, even months later, never existed. Tr. 732-33, 761-62, 1085-87, 1091-93, 1185-86, 1194-96, 1196-1202, 926-29. FBI recordings demonstrated Dillman's knowing misstatements about the Autotrader. Exs. 176-1 through 176-5, 210, 212-14, 218-220, 222. And Dillman's co-conspirator, David Mata, testified in detail about how he and Dillman executed the fraud scheme. Tr. 781-85, 799-801, 863-65. Mata's testimony was corroborated by contemporaneous communications between Dillman and Mata. *See, e.g.*, Exs. 178-181, 183-187, 189, 193, 196. Put simply, this is not an "exceptional case" that warrants a new trial.

### C. The Court's Deliberate Ignorance Instruction Was Correct and Cannot Provide a Basis for a New Trial

Dillman next argues that he is entitled to a new trial because the factual record did not support the Court's deliberate ignorance instruction.[1] Dkt. 145, at 17-18. He claims that the evidentiary record does not establish that he deliberately avoided learning the truth about the existence of a working Autotrader. Dillman cites no caselaw to support his claim. The Court's deliberate ignorance instruction was appropriate. And it did not result in a miscarriage of justice. Dillman's motion must be denied.

"[A] district court may give a deliberate ignorance instruction if it determines that a jury could

[1] Dillman does not challenge the wording of the instruction itself.

rationally find deliberate ignorance, even if the jury had rejected the government's evidence of actual knowledge." *United States v. Ramos-Atondo*, 732 F.3d 1113, 1119 (9th Cir. 2013). "Deliberate ignorance involves (1) a subjective belief that there is a high probability a fact exists and (2) deliberate actions taken to avoid learning the truth." *Id.* (internal citation and quotation omitted). In determining the applicability of the jury instruction, "the district court must view the evidence in the light most favorable to the party requesting it." *Id.*

Here, the deliberate ignorance instruction was appropriate because Dillman disputed his actual knowledge that the Autotrader did not work. *Id.* ("Because the Defendants disputed their actual knowledge, the government was entitled to instructions supporting all rational inferences the jury might draw from the evidence") (internal citation and quotation omitted). At trial, Dillman claimed he lacked actual knowledge that the Autotrader was incomplete or non-existent. Dillman argued that he believed David Mata had a trading algorithm, a bot, and a minimal viable product. Tr. 1785. Dillman further claimed he believed Mata was actually trading with the bot. *Id.* And Dillman claimed that Mata controlled the flow of information about the Autotrader's development. Tr. 1785-86. Dillman even claimed that he did not absorb what was written in emails where he was copied; therefore, even if he received emails informing him that the Autotrader was not complete he did not know that the Autotrader was incomplete. Tr. 1786-87. This was a sufficient basis for a deliberate ignorance instruction. *See Ramos-Atondo*, 732 F.3d at 1119-20. If the jury believed Dillman's position that he did not have actual knowledge that the Autotrader did not work, then the government's evidence could still support the inference that Defendants knew that there was a high probability that the Autotrader did not work but deliberately chose not to confirm that suspicion.

There is ample evidence in the record to support the inference that Dillman was aware of a high probability that the Autotrader did not exist or operate when he solicited investment. *Ramos-Atondo*, 732 F.3d at 1119 ("To show deliberate ignorance, a defendant must have a subjective belief that there is a high probability that a fact exists."). Darren McKeeman, Emmanuel Odeke, John Szeder, and David Mata all testified that they told Dillman the Autotrader could not execute trades. *See, e.g.*, Tr. 732-33, 761-62, 1085-87, 1091-93, 1185-86, 1194-96, 1196-1202, 926-29. Trial exhibits further corroborate that the Autotrader did not work. *See, e.g.*, Exs. 200, 230, 237, 251, 252, 253.

In addition, "[t]he record also supports the inference that [Dillman] engaged in a deliberate act to avoid learning the truth." *Ramos-Atondo*, 732 F.3d at 1119. "A failure to investigate can be a deliberate action." *Id.* Here, "the jury could have inferred that [Dillman's] lack of knowledge resulted from [his] failure to investigate." *Id.* at 1120. As the government argued during closing, Dillman did not require any Autotrader demonstrations, he did not inspect the Autotrader, and "he ignored the engineers." Tr. 1739. The jury could have inferred that Dillman chose not to investigate whether the Autotrader actually worked.

Accordingly, the deliberate ignorance instruction was appropriate. In any event, Dillman makes no valid claim that the deliberate ignorance instruction resulted in a miscarriage of justice.

## III. CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to deny Defendant Japheth Dillman's motion for a new trial and for judgment of acquittal in its entirety.

DATED: October 13, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
CHRISTIAAN H. HIGHSMITH
CHARLES F. BISESTO
Assistant United States Attorneys