RICHARD A. TAMOR (SBN 176529)
TAMOR & TAMOR
The Sierra Building
311 Oak Street, Suite 108
Oakland, CA 94607
Telephone: (415) 655-1969
email: rtamor@TamorLaw.com

JESSE BERKOWITZ (SBN 291464)
BERKOWITZ LAW
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 947-0300
Email: jesse@jesseberkowitzlaw.com

Attorneys for Defendant
JAPHETH DILLMAN

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAPHETH DILLMAN,<br><br>Defendant. | Case No.: CR-23-00140-RS<br><br>**DEFENDANT JAPHETH DILLMAN'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL AND ALTERNATIVELY FOR A NEW TRIAL**<br>(Fed. R. Crim. P. 29 and 33)<br><br>Date: November 17, 2026<br>Time: 9:30 a.m.<br>Courtroom: 12, 19th Floor<br>Judge: Hon. Richard Seeborg |

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. THE RESERVED MOTION MUST BE DECIDED ON THE RESERVED RECORD .......... 1

III. THE REPAYMENT COUNTS REQUIRE PROOF THAT EACH WIRE EXECUTED THE SCHEME .......... 2

A. THE GOVERNMENT MUST ESTABLISH A CONTINUING FRAUDULENT PLAN .......... 2

B. THE CONTEMPORANEOUS EVIDENCE REQUIRES ATTENTION TO PURPOSE AND TIMING .......... 3

C. THE EVIDENCE DOES NOT ESTABLISH THAT EACH PAYMENT FURTHERED THE FRAUD .......... 4

IV. COUNTS ONE AND FIVE REQUIRE SEPARATE ANALYSIS OF AGREEMENT AND KNOWLEDGE .......... 6

V. RULE 33 REQUIRES INDEPENDENT REVIEW OF THE EVIDENCE AND TRIAL ERRORS .......... 9

A. THE WEIGHT OF THE EVIDENCE WARRANTS A SEPARATE DECISION .......... 9

B. THE MADOFF ARGUMENT IMPROPERLY SUPPLIED A PURPOSE FOR REPAYMENT .......... 10

C. THE RECORD DOES NOT ESTABLISH PURPOSEFUL AVOIDANCE OF THE TRUTH .......... 12

VI. CONCLUSION .......... 13

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

# TABLE OF AUTHORITIES

## Cases

*Schmuck v. United States*, 489 U.S. 705 (1989) .................... 2, 3
*United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992) .................... 9
*United States v. Falsia*, 724 F.2d 1339 (9th Cir. 1983) .................... 10, 11
*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc) .................... 12, 13
*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) .................... 9
*United States v. Maze*, 414 U.S. 395 (1974) .................... 3
*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) .................... 6
*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) .................... 2
*United States v. Sampson*, 371 U.S. 75 (1962) .................... 3
*United States v. Sanchez*, 659 F.3d 1252 (9th Cir. 2011) .................... 11
*United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014) .................... 3
*United States v. Young*, 470 U.S. 1 (1985) .................... 11

## Rules

Federal Rule of Criminal Procedure 29 .................... passim
Federal Rule of Criminal Procedure 33 .................... passim

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

## I. INTRODUCTION

Proof of a fraud does not establish that every later payment executed the fraud. Counts Two through Four charge actual returns of principal after the fund's trading period ended. The government relies on the recipients' reassurance, their expectations of additional profits, and Mr. Dillman's selection of repayment recipients. However, the question remains whether the evidence, considered together, establishes beyond a reasonable doubt that each charged payment furthered a continuing fraudulent plan.[1] The government's own witness identified an obligation to repay: "Because the fund was over. We had to return the investors' money to them after having held it and basically lost a good portion of it." TR 913:12–14. David Mata also conceded that Mr. Dillman did not explain how he selected recipients. TR 914:24–915:2.

The defense seeks separate decisions under the governing standards. Rule 29(b) fixes the record at reservation; Rule 29(c) permits consideration of the complete record. Rule 33 independently requires the Court to weigh the evidence and assess the asserted trial errors. The repayment counts warrant particular scrutiny under each standard. The Court should grant acquittal or, alternatively, a new trial.

## II. THE RESERVED MOTION MUST BE DECIDED ON THE RESERVED RECORD

The government agrees that Mr. Dillman's testimony and exhibits first introduced during his testimony cannot cure a deficiency in the reserved motion on Counts Two through Five. Opp. 2, 11. Rule 29(b) requires decision on the evidence before the Court when it reserved ruling. That record includes defense exhibits admitted during cross-examination of

[1] "Opp." refers to the printed pages of Dkt. 148; "TR" to printed trial-transcript pages; "Ex." to government trial exhibits; and "Defense Exhibit" to defense exhibits. Exhibit page references use the exhibit's page labels.

government witnesses; it excludes evidence first admitted during the defense case, whether favorable to the prosecution or the defense.

The government nevertheless says counsel "specifically omitted Count One" from the oral motion. Opp. 2. Counsel began with an unqualified motion "under Rule 29 for a judgment of acquittal," then identified insufficient proof "at least with respect to Counts Two, Three, Four, and Five." TR 1483:23–1484:2. "At least" did not withdraw the general request or expressly exclude Count One. The Court reserved "the question" without announcing a count limitation. TR 1485:11–12. The defense asks the Court to apply that reservation to the motion as made. Alternatively, Count One remains before the Court under Rule 29(c), which does not require a motion before submission to the jury. Fed. R. Crim. P. 29(c)(3).

The evidence and reasonable inferences must be viewed favorably to the prosecution; the Court may not choose an innocent interpretation merely because one is available. *United States v. Nevils*, 598 F.3d 1158, 1164–65 (9th Cir. 2010) (en banc). The inquiry remains whether a rational juror could find every element beyond a reasonable doubt. The sufficiency discussion below uses the reserved record unless it expressly addresses Mr. Dillman's later testimony. Credibility disputes and competing explanations receive independent consideration under Rule 33.

## III. THE REPAYMENT COUNTS REQUIRE PROOF THAT EACH WIRE EXECUTED THE SCHEME

### A. THE GOVERNMENT MUST ESTABLISH A CONTINUING FRAUDULENT PLAN

A wire need not contain a falsehood or obtain additional funds. It is enough that it be incident to an essential part of the scheme. *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989). Planned lulling can qualify after the initial receipt of the victims' money. *United*

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

*States v. Sampson*, 371 U.S. 75, 80–81 (1962). But a transaction following a fraud does not necessarily execute it. *United States v. Maze*, 414 U.S. 395, 400–03 (1974).

The opposition correctly recognizes that a general desire to avoid detection does not indefinitely extend an otherwise completed scheme. Opp. 6. *United States v. Tanke*, 743 F.3d 1296, 1303–06 (9th Cir. 2014), requires examination of the scheme's scope and the challenged communication's role. A concealment plan may develop while the scheme continues; it need not exist from the outset. *Id.* at 1305. The prosecution must nevertheless establish the continuing plan and the wire's place in it.

*Tanke* affirmed because the communication continued a sequence of misleading transactions and explanations implementing the scheme. *Id.* at 1305–06. Here the question is whether the distributions of principal served a comparable function. Ending the trading period does not itself establish the end of a fraudulent scheme. Conversely, unpaid obligations and unfinished liquidation do not themselves establish that the scheme continued. The inquiry concerns the scheme as conceived by the defendant when the wire occurred. *Schmuck*, 489 U.S. at 715.

The defense does not argue that repayment excuses fraudulent inducement. Repayment matters because these payments are the charged wires, and the government must establish their function in the scheme. A lawful purpose can coexist with a fraudulent purpose. The question is whether the evidence proves the latter beyond a reasonable doubt.

**<u>B. THE CONTEMPORANEOUS EVIDENCE REQUIRES ATTENTION TO PURPOSE AND TIMING</u>**

Mata testified that the men discussed returning funds because the fund was over and investors had to be repaid. TR 913:6–14. There was insufficient money to repay everyone. TR 913:15–17. Mr. Dillman chose recipients and amounts, but Mata did not know his thought process and did not ask. TR 914:4–5, 914:24–915:2. Selection was established; an

express agreement to use the selections to conceal fraud was not. Such an agreement may be inferred, but Mata's testimony cannot be enlarged into a firsthand account he did not give.

The records document efforts to obtain money for distribution. On January 16, 2018, Mr. Dillman pressed Mata to liquidate while Mata requested more time. Ex. 189, p. 1; TR 926–29. In the July 27–30, 2018, exchange, Mr. Dillman demanded a timetable and a detailed account of Baiton's fundraising. Ex. 196, pp. 1–2. The same exchange reflects pressure from unpaid investors and threatened litigation. Both aspects matter; the repayment obligation does not vanish because investors threatened to enforce it.

The chronology also matters. Exhibit 196 postdates the Tucker and Hennings payments by more than two months. It does not identify either investor or describe a plan for those May distributions. The August 28, 2018, update came after all three charged payments. Later evidence can illuminate an earlier purpose, but it cannot be treated as contemporaneous merely because the fund still owed money. The opposition's collective account of communications made "during these repayments" and "at the same time" obscures those intervals. Opp. 7. Each payment requires its own connection to the asserted continuing plan.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

**C. THE EVIDENCE DOES NOT ESTABLISH THAT EACH PAYMENT FURTHERED THE FRAUD**

**Count Two.** The May 17, 2018, wire returned $29,970 to Amy Tucker, her $30,000 principal less the wire fee. Ex. 41, p. 2; TR 499:13–19. The April 25, 2018 communication proposed returning principal from funds released by GDAX while the CPA calculated earnings. Ex. 94, pp. 1–2. Tucker supplied banking information, Mata arranged the payment, and she confirmed receipt. Ex. 94, p. 1. Her interest in Fund II preceded repayment, as the government now acknowledges. Ex. 93, p. 1; Opp. 8. She never threatened suit to obtain her principal. TR 511:6–8.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

The government relies on her relief, optimism, and continued expectation of gains. TR 499–500. Exhibit 94 also claimed that an extension doubled the cold-storage deal's value. That claim supports the government's broader deception theory, but it does not dispense with proof concerning the May 17 payment. The principal-first proposal applied to the limited partners generally and identified available exchange funds as the source. Ex. 94, p. 2. The actual payment fulfilled that announced obligation. The inference that its purpose was to sustain a false appearance of success requires more than the predictable fact that Tucker was reassured and still awaited an accounting.

**Count Three.** The May 24, 2018, wire returned Nathan Hennings's $50,000 principal after repeated demands. Ex. 41, p. 2; TR 366–68. Hennings said repayment legitimized the fund, left him expecting approximately $22,000 more, and reduced the urgency of contacting law enforcement. TR 368:15–369:23. The testimony describes the payment's effect, however, and the government acknowledges that his reaction alone did not conclusively establish Mr. Dillman's purpose. Opp. 8.

The additional selection testimony must be read with Mata's lack of knowledge about the selection process and his explanation that investors had to be repaid. TR 913–15. Together, demands, repayment, and reassurance show that an overdue obligation was partly discharged and the recipient felt more secure. The disputed step is whether that payment executed fraudulent concealment. Direct proof is unnecessary, but neither control over repayment nor a creditor's relief automatically supplies that connection. The July and August communications must be assessed for what they show about the May 24 purpose, rather than used to assume that a single concealment plan governed every distribution.

**Count Four.** The August 7, 2018, wire returned $24,970 to Sugar Mountain Holdings, LLC, Neil Sunkin's investment entity. Ex. 42, p. 2; TR 682–84. Here the late-July messages preceded the payment, making them stronger contextual evidence than on Counts

Two and Three. They show known pressure to repay, including threatened litigation. Ex. 196; TR 932–34. But they also show Mr. Dillman demanding concrete funding information from Baiton so the outstanding position could be resolved.

Sunkin's demands and continuing expectation of profits support the government's inference. TR 678–87. The inference still must concern this payment's role in fraudulent concealment. Exhibit 196 contains no direction to disguise Sunkin's payment or use it to validate a performance report; it records efforts to recover funds amid mounting demands. That absence is not dispositive, but it limits what the exchange proves. The subsequent August 28 email must be considered separately, including its express disclosure that trading had stopped. Ex. 80, p. 1. Avoiding litigation over an overdue obligation does not, without the required connection to the fraudulent plan, establish execution of wire fraud.

These circumstances must be considered together, favorably to the government, rather than rejected one by one because each admits an innocent explanation. Even so, the defense submits that the inference from selection and reassurance to execution of a fraudulent plan does not establish the charged connection beyond a reasonable doubt. Co-schemer and aiding-and-abetting liability do not eliminate that element. TR 1701–03. The Court should acquit on Counts Two through Four or independently weigh these same circumstances under Rule 33.

## IV. COUNTS ONE AND FIVE REQUIRE SEPARATE ANALYSIS OF AGREEMENT AND KNOWLEDGE

The defense preserves its challenges to Counts One and Five. Intent to defraud requires an intent to deceive and cheat, including obtaining money or property through deception. *United States v. Miller*, 953 F.3d 1095, 1101–03 (9th Cir. 2020). Count One requires a knowing agreement to accomplish the unlawful object, not merely joint participation in a business. TR 1697–99.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

The opposition overstates Mata's testimony that the men jointly decided to leave the July 9, 2017, email uncorrected. Opp. 5. Asked whether he corrected Mr. Dillman, Mata said, "I don't remember." TR 864:4–5. He explained his own decision not to correct the investor because it would hurt fundraising. TR 864:16–22. He also testified that he had discussed the absence of a working auto-trader with Mr. Dillman. TR 865:4–9. Similarly, when asked whether the men discussed why they would represent that an auto-trader had been built, Mata answered, "I don't remember." TR 802:20–22. An inference of agreement remains possible; an express joint decision was not his testimony.

The other conspiracy evidence must be confronted. Mata described discussions of misleading cold-storage labels; Exhibits 183 and 228 concern proposed transactions and how holdings would appear in the fund's records. Ex. 183, p. 1; Ex. 228, p. 1; TR 889–91, 905–11. This evidence supplies a separate basis for the government's agreement theory. The defense asks the Court to assess the actual communications and their scope, rather than accept the opposition's expanded account of Mata's testimony. Acquittal on the repayment counts would not automatically dispose of Count One; conversely, proof of a conspiracy would not establish that every later payment executed it.

Count Five concerns the August 28, 2018 update. Ex. 80. The email said the technology was effective and had been used, while promoting a future fund. Tucker and Robinson understood it to describe working technology. TR 501–03, 1307–09. Those are substantial points for the government. Yet Robinson also described the delayed-distribution explanation as another excuse that worried her. TR 1308:12–16. Actual reliance is unnecessary; these differing reactions underscore why the email's purpose must be assessed from its complete contents and the evidence of Mr. Dillman's knowledge.

The email expressly stated that the trading account closed in January and that the fund was no longer trading. It identified a remaining third-party position, previously

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

described as cold storage, and said final winding down and distributions would follow its liquidation. Ex. 80, p. 1. It therefore did not represent that current trading was generating profits. Those disclosures neither establish that the entire account was truthful nor reveal every alleged deception. They nevertheless limit the opposition's characterization of an unqualified assurance of ongoing successful operations. See Opp. 9–10.

The engineering evidence bears on what Mr. Dillman understood in August 2018. McKeeman denied reporting a completed auto-trader, and Szeder and Odeke distinguished identifying opportunities from automatically executing trades. TR 761–62, 1098–1102, 1196–1202. But Szeder previously testified under oath that the prototype identified and executed trades, then corrected that account the day before his testimony in this trial. TR 1106–11. His January 14, 2018, email reported rebuilt, deployed software that was untested but should be able to place orders with a $500 cap. Ex. 112, p. 1. Odeke explained that manual intervention remained necessary. TR 1200–01. The defense does not equate that software with autonomous trading. The qualified reports and Szeder's own confusion bear on knowledge of falsity, particularly at the time of the August update.

The later defense case must be considered separately. Mr. Dillman acknowledged that the system never traded automatically between exchanges and admitted misleading descriptions of cold storage and other transactions. TR 1645, 1661–62, 1673–74, 1678. He also testified that Mata supplied the substantive technology account used in the August update. TR 1624–26. Those admissions support the prosecution, but their subject and timing must be evaluated alongside his explanation. They do not enter the reserved record. The Court should decide Count Five on that record, and separately decide the alternative motions on the complete evidence.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

## V. RULE 33 REQUIRES INDEPENDENT REVIEW OF THE EVIDENCE AND TRIAL ERRORS

### A. THE WEIGHT OF THE EVIDENCE WARRANTS A SEPARATE DECISION

The response that the jury heard the credibility disputes does not complete Rule 33 review. Opp. 6, 14. The Court may weigh the evidence and assess credibility independently. *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211–12 (9th Cir. 1992); *United States v. Kellington*, 217 F.3d 1084, 1095, 1097 (9th Cir. 2000). Relief on this ground requires an exceptional case in which the evidence weighs heavily against the verdict and a serious miscarriage of justice may have occurred. The defense seeks that determination, not a new trial merely because another verdict was possible.

Mata admitted a false sworn declaration and his hope for a reduced sentence dependent on the government's substantial-assistance assessment. TR 944–50. These facts do not require rejection of everything he said. They matter particularly when his direct account was that investors had to be repaid, he did not know Mr. Dillman's selection rationale, and his account of the August update's purpose was an "impression." TR 913–15, 935:8–11. His incriminating interpretation should be weighed against those limits and the contemporaneous liquidation demands, rather than treated as interchangeable with firsthand knowledge.

Mr. Dillman's testimony supplies adverse evidence as well: he acknowledged prioritizing investors threatening litigation, but explained that he sought to avoid additional legal costs. TR 1593:1–17, 1595:4–11. Under Rule 33, the Court may evaluate that explanation against the documented returns of principal and efforts to obtain funds from Baiton. The critical question is the purpose of the charged repayments, not whether every statement about the fund was accurate. Independently weighing that evidence, and the gaps

between the May payments and later communications, supports a new trial on the repayment counts even if the government's inference survives Rule 29.

The Court should also weigh the changed engineering testimony and qualified development reports when assessing knowledge on Counts One and Five. Genuine development does not excuse knowing deception; its significance is whether the descriptions reflected deliberate falsity or a mistaken understanding of capabilities. The opening motion requested independent weight review as well as relief for trial error. Each ground requires a ruling.

**B. THE MADOFF ARGUMENT IMPROPERLY SUPPLIED A PURPOSE FOR REPAYMENT**

Defense counsel argued that fraudsters do not return money or profits. TR 1807–08. The government could argue from the record that repayment and fraud can coexist and that repayment can lull investors. *United States v. Falsia*, 724 F.2d 1339, 1342–43 (9th Cir. 1983), permits fair responsive advocacy. It does not end the inquiry into the particular response or its prejudice.

The prosecutor moved from Grimm's admitted reference to "Madoffesque shenanigans" to an assertion about another person's conduct: "That's what Madoff did. That's a Ponzi scheme." He then described returning money to prevent complaints, lawsuits, and detection. TR 1815:8–20. The opposition denies that an analogy was drawn. Opp. 12–13. But the example supplied the very purpose the government urged the jury to assign to Mr. Dillman's repayments.

The Court had allowed Grimm's references after considering prejudice, and Grimm described his concerns in testimony. TR 837–41, 1068–71. The defense does not claim that all mention of Madoff was forbidden or absent from the record. The distinction is between an investor's concern and evidence establishing how Madoff used repayments to execute his fraud. Grimm's communications did not establish the latter or prove the purpose of these

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

payments. In denying a curative instruction, the Court itself noted the lack of evidence about the Madoff scandal beyond the admitted reference and stated that the comparison preferably would not have been made. TR 1832:21–1833:7.

*United States v. Young*, 470 U.S. 1, 11–13 (1985), requires consideration of the response in context, including defense counsel's arguments. It does not confer unrestricted license to introduce an improper basis for conviction. A brief rebuttal can prejudice a central disputed issue. See *United States v. Sanchez*, 659 F.3d 1252, 1256–61 (9th Cir. 2011) (finding prejudicial rebuttal under plain-error review). Neither case makes a notorious reference automatically reversible; the inquiry is its effect here.

The particular prejudice concerns Counts Two through Four. The jury had to decide whether actual distributions served an obligation to repay or implemented fraudulent concealment. The Madoff example supplied a notorious instance in which repayment signified concealment, inviting the jury to resolve the purpose of these wires by association. Evidence of misleading fundraising does not answer that distinct question. Nor does the brevity of the reference eliminate its force on the disputed inference.

The Court previously found insufficient prejudice to require a cure and noted the timing of the request. TR 1831–33. The defense asks for reconsideration under Rule 33. The statement that counsel preserved the record does not itself resolve the standard of review. The requested targeted instruction was denied; the general instruction that argument is not evidence did not address the use of Madoff's conduct to supply a purpose for repayment. TR 1692:13–24. In context, the defense submits that the argument more probably than not affected the repayment verdicts. *Falsia*, 724 F.2d at 1343.

## C. THE RECORD DOES NOT ESTABLISH PURPOSEFUL AVOIDANCE OF THE TRUTH

The defense challenges the factual basis for Instruction 21, not its wording. It required awareness of a high probability that material auto-trader representations were false

and deliberate avoidance of the truth. It excluded actual belief in their truth and mere negligence, carelessness, or foolishness. TR 1703:14–24. Defense counsel objected at the charging conference and incorporated the written objection. TR 1441–42. The factual basis must be assessed on the complete trial record, including the subsequent defense testimony. Under *United States v. Heredia*, 483 F.3d 913, 922–24 (9th Cir. 2007) (en banc), the question is whether, viewing the evidence favorably to the government, a jury could find deliberate ignorance if it rejected actual knowledge. Denial of knowledge alone does not establish purposeful avoidance.

The opposition cites defense counsel's argument about copied emails and the prosecutor's argument that Mr. Dillman never sought demonstrations or inspected the technology. Opp. 15–16; TR 1739, 1785–87. Those arguments are not evidence. The underlying testimony must be examined. When preparing the pitch, Mr. Dillman declined to inspect Mata's binder and laptop because he would not have understood them; he asked instead for the technology stack and results. TR 1525:19–24. The government may argue that this was avoidance. But the explanation identifies a request for information in an understandable form, not a refusal to obtain information about whether the technology worked.

The record also shows affirmative inquiry. Mr. Dillman asked Szeder to assess McKeeman's code and received the qualified response that it was usable and readable, incomplete, and a reasonable start. Ex. 110, p. 1; TR 1111–14. McKeeman described regular updates and meetings with him. TR 761:7–15. Odeke recalled Mr. Dillman asking about progress in person. TR 1194–95. Those communications may support actual knowledge of limitations. They do not, merely because the limitations were serious, establish a deliberate effort to avoid learning them.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

Mr. Dillman also testified to seeing a January 2018 demonstration and identified the interface in Defense Exhibit 26. TR 1613–18. The screenshots show errors and manual controls, not proof of autonomous trading. TR 1617:9–17, 1657–59. That later demonstration does not establish his knowledge during the initial 2017 solicitations. It does contradict the broad assertion that he never looked, and it bears on his understanding when he sent the August 2018 update. The Court must distinguish inadequate inquiry, misunderstanding, and actual knowledge from a purposeful choice to remain ignorant. *Heredia*, 483 F.3d at 918 & n.4, 922–24.

The instruction's safeguards and the government's actual-knowledge evidence bear on prejudice, but do not resolve it. The prosecutor expressly urged failure to inspect and reliance on Mata as an alternative route to knowledge. TR 1739. The changed engineering testimony, qualified reports, and asserted demonstration gave the jury a concrete reason to question actual knowledge, especially on Count Five. The disputed instruction permitted the prosecution to answer that doubt with an avoidance theory the defense submits lacked sufficient factual support. The general verdict alone does not establish prejudice; the record and the prosecutor's express reliance on that theory do. The Court should assess this error separately and together with the Madoff argument, and grant a new trial on the affected counts.

## VI. CONCLUSION

Mr. Dillman requests judgments of acquittal on all counts under Rule 29(b), alternatively under Rule 29(c), and, at minimum, acquittal on Counts Two through Four. Alternatively, he requests a new trial under Rule 33, including independent consideration of the repayment counts. If the Court grants acquittal, it should also make the conditional new-trial determination required by Rule 29(d)(1), stating its reasons.

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969

Dated: October 27, 2026

Respectfully submitted,

TAMOR & TAMOR
_/s/_________________________________
By: RICHARD A. TAMOR

BERKOWITZ LAW
_/s/_________________________________
By: JESSE BERKOWITZ

Attorneys for Defendant JAPHETH DILLMAN

TAMOR & TAMOR
311 Oak Street, Suite 108, Oakland, CA 94607
Telephone: (415) 655-1969